I have to ask whether you can hear me clearly, because it's difficult for me to tell what my level of voice is because I have the earphones, and is that loud enough? The louder the better. All right. I'll try to do better, Your Honor. Is that better? This, of course, involves 1983 deprivations of a school principal's property and liberty interests without due process and Arizona common law claims of intentional interference with contract. Mr. Lopez lost his case after almost six weeks of trial on Rule 50 motions, multiple Rule 50 motions. In ruling on the Rule 50 motions, the district court judge either ignored Mr. Lopez's testimony or he impermissibly decided that Mr. Lopez was not credible. The judge also ignored other evidence that was in the record. Well, how do we know that? The judge heard all the evidence. Is that right? Yes, Your Honor. The judge said, I've heard all the evidence, and that would not support a jury verdict in your client's favor. He heard all of it. He did hear it. He was certainly there, Your Honor, but when he discussed They hear this argument all the time. If they don't say something about everything, they ignored it, and that's not the way the system works. Well, Your Honor, when the district court judge discussed what evidence there was in support of particular claims, he certainly didn't mention a lot of the evidence that was in my client's favor. In fact, this Rule 50 motion looks as if he only listened to the evidence that the defendants put on. Well, the question is whether your client got due process. Is that right? That's correct, Your Honor. It appears to me that there was a remarkable hearing that it lasted 11 days. Your client was represented by counsel. Counsel got to participate in direct examination, cross-examination. It was rather astonishingly loaded with process. It seems that your only claim is that, well, they were biased against him, but I can't find anywhere where you carry your burden of demonstrating with evidence that they were biased against him, the adjudicators. Well, Your Honor, there was certainly a very long hearing and a very long transcript. As a matter of fact, defense counsel started their opening statement by banging the transcript in front of the jury and showing them. But you don't get due process just because you had a long hearing, and you don't get due process just because you had an attorney representing you. What was lacking? Precisely what was lacking that rendered this a denial of due process? First of all, Your Honor, under the Arizona statute, Mr. Lopez was required to be informed what the charges were against him so he could prepare his defense. Well, he was. There was a statement of charges, and it had to do with six sexual harassment charges, six different women. The problem was that even though those were the charges that was given to him, there is ample evidence from which a jury could decide that that wasn't the reason for the termination. That wasn't the reason that the board decided to uphold the superintendent's decision that Mr. Lopez should be terminated. What was the reason, in your view? What was the reason? Well, actually, Mary Carr, who was one of the board members and the board member who proposed the motion at the final hearing to terminate Mr. Lopez, she told us how she decided. And she said, she used the phrase, a lot, a lot of her decision depended on what had happened in the closed sessions. And, Your Honor, in the supplemental excerpts of record, I gave the court all of the closed session transcripts. The important thing about the closed session transcripts is that none of those closed sessions had anything at all to do with the six claims of sexual harassment. They had to do with other things, Your Honor. So if a lot of her decision depended on what she heard in the closed sessions, then she wasn't deciding based on the six charges of sexual harassment. That's just one piece of evidence, Your Honor. So that is very significant in terms of Mr. Lopez not getting due process. So you say that the scope of the hearing was limited by the charges of which he was advised at the beginning, and then the hearing exceeded that scope? Well, it's more than that, actually. It's more than that they went without the scope. It's more than that other evidence was admitted. It's the fact that Mary Carr says that a lot of her decision depended on that. Was there an objection during that hearing that information is now coming in that's outside of the scope of the charges that were required to defend? Actually, there was, yes. How was that dealt with? It was overruled, yes. There were objections to some of this evidence. Your Honor, I don't believe that a reason was given. The rulings were made by the president of the board who was ‑‑ I don't believe he gave a reason. I believe he just overruled Mr. Montoya. That was Mr. Lopez's attorney. How many people made the decision? How many people? Four of them. And so you point to one person saying a lot of my decision is based on the stuff in the closed hearings. That's true, but she's also the person who proposed the motion to terminate him. What else was lacking in due process? And in connection with that, Mr. Scheel, who's also one of the board members who voted and was the president of the governing body at the time, he also said that ‑‑ he testified at trial that he had been leaning towards termination. And so he asked the county attorney who was assisting the board at the hearing. Sorry, I'm having a lot of interference. I don't know if I'm creating it or not, so I'm going to. I'm distracting myself with all the noises that are coming through on here. Mr. Scheel said that he was leaning towards terminating Mr. Lopez, and so he asked the county attorney to draft findings that would uphold the termination. So one of the other aspects of lack of due process is that the board did not do what they were supposed to do. They were supposed to look at the six charges. They were supposed to make factual findings as to each of those six charges and then draw a conclusion as to whether or not that was sexual harassment in each case. But it appears from Mr. Scheel's testimony that what he did, so that's a second one out of the four, what he did was decide first that he was leaning towards termination and then asked the county attorney to draft some findings, conclusions, and an order that would uphold it if that's what they decided to do. So that's two out of the four. There is no evidence from Mr. Oskarska that relates to this particular issue, and Mr. Ned was already dead by the time of the trial, so we couldn't ask him. So that's two out of four, Your Honor. And those issues are pretty significant, but they're still not the only things that means that Mr. Lopez was deprived of due process at the hearing, because there are other things as well. There was no deliberation before the findings, conclusions, and order were adopted, before the motion was granted. And the three board members who were at trial, because, of course, Mr. Ned was dead, in fact, they were rather unclear about how they'd done it, but the story that they gave was that there had been no deliberation at all anywhere, that they had all taken the transcripts home and thought about it themselves, and then they came together at the final day and just voted. However, if you look at the transcripts. If a jury did that, would that be a defective thing? The jurors all get out there and say, we've heard all the evidence. Let's vote. Whoops, it's 12-0. And then call the bailiff. I don't know, Your Honor, but this isn't. I mean, the problem with this is this is a school board. There are open meeting requirements. They are supposed to decide things as a board. They are supposed to deliberate. They took a vote after reading all that, after looking at the transcripts, I hear you say. Yes, but it says in the findings, conclusion, and order that they did deliberate. It says in there that they deliberated. So the question is where they did it. And in the transcript, on the day before the final hearing date, that's the November 10, 1994 transcript, it's the final page in there. Mr. Scheel says that they are going into executive session to consult with counsel, which they're certainly perfectly entitled to do, and begin their deliberations. So a reasonable jury could certainly decide, based on what's in the transcript, what Mr. Scheel says, and what's in the factual findings, that, in fact, the board did deliberate, and they did it in secret, which they were not allowed to do under the Arizona open meeting laws and because Mr. Lopez had specifically asked that this hearing be in public. So if they did it secretly, the question is why did they have to decide secretly? That's certainly evidence that they were not doing it properly. And, Your Honor, we're not arguing that each of these things individually failed to give Mr. Lopez due process. The thing is, if you look at all of these things together, that shows the lack of due process. There's more. There was also something that occurred in the middle of these hearings where John Carpenter, who was the fifth board member who was not sued, recused himself. And he got up, and the transcript is in the excerpts of the record as part of those supplemental excerpts, and he got up in the middle of this and he said that he was going to have to recuse himself because he had personally spoken to one of these women. It wasn't one of the six women who filed the charge, but some other woman that they brought up in closed sessions. And he had personally spoken to this woman, and so they would have to recuse himself. But he had heard directly from her something about what Mr. Lopez had done. The interesting thing about it is the record also shows that he had spoken to Mary Carr and Jesus Escarcica about what he had heard from this person. So, although he recused himself, the other two people were still there, and Mr. Lopez was still not told, him and his attorney were not told, even in the hearing, what the story was, so that he could deal with it, so they certainly heard it, and it was supposedly about sexual harassment. And then there's also the fact that this particular school board had, the year previously, fired a superintendent. It's kind of confusing in this place, and I know the district court judge was confused, because her name is Gladys Hannan, it's H-A-N-N-O-N, the superintendent, not to be confused with Kristen Hanna, with A-H at the end, who was a defendant in this case. Anyway, the school board had fired Gladys Hannan the year before, and one of the reasons they gave in the letter that they sent to her, telling her she was going to be terminated, is that she'd failed to deal with, properly deal with, allegations of sexual harassment that had been made against Mr. Lopez. So the school board thought that they knew, and I'm using that phrase on purpose, that even before these six charges had been made, there had been other charges made against Mr. Lopez in the school year before. But they didn't tell Mr. Lopez and his attorney about that, and Mr. Lopez testified at trial, not at the hearing, that he had no idea about that. And it turned out, because the custodian of records for the school district was asked to appear at trial, bringing with her any previous accusations of sexual harassment that had been made against Mr. Lopez, it turned out there were none. So this is particularly prejudicial. It's not as if there had been written complaints of sexual harassment the year before that everybody knew about, that Mr. Lopez could then deal with at the hearing. This was totally off the wall. I think that those are the basic reasons why due process was denied to Mr. Lopez. What evidence do you have that the decision-makers, other than what you've talked about, were actually biased against your... I don't, Your Honor. I don't have any additional evidence. I believe I've covered everything. If I didn't, then it's in the briefs. So that's the due process issue. Then we have the issue about causation. And much was made at the Rule 50 hearings of a Second Circuit case, Taylor. And again, the appellees, I believe it's in the joint answering brief, I don't recall exactly, cite to this case and say that it ought to be dispositive. The theory on the Rule 50 motions is that all of Mr. Lopez's damages arose from his termination, one way or another. Because obviously the loss of his property interest has to do with him being terminated from his position. And the loss of his liberty interest has in part to do with him being terminated from his position because of the stigma plus test, that he lost his reputation and good name in connection with his termination. So without the termination, there would be no 1983 claims was the argument. And so the argument went further, that because it was only the board who decided to terminate him, and they had this long hearing and heard all of this evidence, then anyone else's causal connection to the deprivation was just too tenuous. And so a district court judge decided that a causation basically took everybody else out of the lawsuit, out of the 1983 claims, other than the board members. There's a serious problem with this, Your Honor. First of all, the district court judge should have followed Ninth Circuit precedent that's cited in the opening brief, not Taylor. But even so, Taylor is easily distinguishable. In that particular case, what had happened is that a report had been made to a school principal of, it was inappropriate physical contact, actually, by one of the school employees. And she had reported this. And then there had been an independent investigation and an independent hearing, and the board had decided to terminate this person. I recognize there are some similarities with the Mr. Lopez case right there, but there are also some very important dissimilarities. In the Taylor case, the principal who made the report was not a witness, was not personally involved, did not pass on anything other than the fact that a report had been made and everything was done independently. But in this particular case, the other defendants were significant players. The women who complained testified at the hearing. The women who complained wrote their complaints. They were certainly causally connected to the final decision to terminate Mr. Lopez. And they are not the only people who are causally connected. There are also the people who wrote the public complaint that happened before the six complaints of sexual harassment. The appellees would like this court to believe that the public complaint has absolutely nothing to do with what matters on this appeal, just as they made the same argument to the district court judge, but it does. The public complaint was discussed at the hearing in one of those closed sessions. And not only the public complaint, but also Mr. Lopez's evaluation that was given to him in June of, it was an addendum to his evaluation that was given to him in June of 1994 based on the public complaint. So what people said in the public complaint certainly had input into the hearing and into the result, the decision to terminate Mr. Lopez. In addition, Chris Hannah had some input causally. She was causally related to the final decision to terminate Mr. Lopez because she was the one who gave the information to the board, which made them believe that there had been previous complaints of sexual harassment against Mr. Lopez while he was teaching at the other school, the prep. And the superintendent, Patricia Williams, was also causally related to the decision to terminate because she was the one who went in the secret executive session on July 12th with the board and assisted her attorney give the one-sided story to the board. So these people were causally connected, unlike the principal and Taylor. So the district court judge should not have made that decision. One of the other things that the district court did was limit Mr. Lopez's liberty claim so that basically it became trivial and easy to dispose of. I'm not suggesting it did that on purpose, but that's what happened. The district court judge, well, it looks like I have less than a minute left, so I'm going to try to reserve what's left of it. Okay. Let me certainly do that. And of course, we take a brief recess before we continue with argument. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you. Good morning, Your Honors. I'm Terrence P. Woods. With the Court's permission, we'd like to divide our time in three. Basically, the complainers and the processors, the deciders, and the uniquely situated one is Mr. Ortega, the lawyer. Mr. Holohan represents him. I'll try to be brief. As the Court has already commented, this is a personnel matter in which there was an 11-day, 2,000-page transcript hearing. There was an appeal to the Superior Court in the State, and the termination was upheld. And then this suit in the Federal Court followed that. I think the Court is correct that due process is the issue here. It's the only issue. And the District Court commented that, if anything, Mr. Lopez got more due process than he deserved. I don't know whether deserved is the right term, but he got a lot of due process. When this case went to the District Court, a distinguished senior judge handled this case for four years. There are, in the record, two orders totaling about 150 pages, the summary judgment order and the Rule 50 order. I think the Rule 50 order is exhaustive and decisive and determinative of all the issues that are before the Court. And, frankly, we can't make any really better legal arguments in a more concise fashion than the Court did in its order, and we adopt that as an argument. Just to go right to some of the points that Judith made, I think that the summary of our argument is that the complainers had a right to complain, whether you call it a Knorr-Pennington right, or the complainers had a right to complain. The processors, specifically Williams and Hannah, had a duty to process. When they got these complaints, they had a duty to process them. And the deciders had a duty to decide the case. So as to the complainers and the processors. I suppose the heart of her position is that they mixed and matched. No. The deciders actually were prosecutors, actually had knowledge that wasn't imparted and whatever. Well, Your Honor, I think all that she complains of is not that they mixed and matched or intertwined, but that the deciders had some information other than the information that was contained in the formal charges. I want to point out to the Court that these closed hearings or these secret hearings that she refers to, counsel for the claimant was invited to those meetings. Mr. Lopez's lawyer was there. So these secret meetings weren't secret from his lawyer. And if the process was tainted, well, there was a process, his lawyer was there, and there was an appeal from that process. And as we sit here today, we still have no evidence other than the suggestion as to what it was these people learned that somehow or another tainted them. I mean, this case is 10 years old, and we still don't have an answer to that question. As a matter of fact, when Your Honor asked what was the reason he got fired, there isn't an answer today for that. There was a theory that was put out at the beginning of trial, and the theory that was put out at the beginning of trial was that there was a conspiracy, and that was the word they used, and then they abandoned conspiracy during the trial. But originally this was pled as a conspiracy to get rid of him so that somebody's brother could get the job as the principal at the school. But that's long since been abandoned. And when you ask that question today, it's a question that doesn't have an answer. Now, I want to go right to this question that was raised right at the end, because I think it's the only question that has much importance as to the complainers and the processors, and that is Ms. Pragle's argument that the Second Circuit law, the Taylor case, shouldn't be applied and, in fact, the appropriate standards found in a Ninth Circuit case called Redmond v. County of San Diego, which is cited in the papers. Well, the Redmond case is certainly good law, but not inconsistent with our argument in the Taylor case. What the Redmond case says is that on 1983 causation, the requisite causal connection can be established by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury. Well, all that's been argued here is that the complainers and the processors, some of them, set in motion a series of events that resulted in the termination and that they should have known it was going to result in the termination. Well, that's so obvious we don't dispute it. Several of these people wanted Mr. Lopez to get fired. So clearly they set in motion a process which they hoped would result in his termination. But that's not prohibited by Redmond. What's prohibited is setting in motion a series of events which the actor should know or know is going to result in the deprivation of a constitutional right. And the proof that any of these people had any idea that the school board was going to deprive this fellow of his constitutional rights, which of course they didn't, but the proof that that was going to happen is absolutely absent. That's the biggest missing item in this case, is any kind of showing that anybody knew this guy was going to be deprived of his constitutional rights. And short of that, the non-decision makers can't be held liable for a 1983 injury. The Court is right in its one paragraph on causation. And I don't think there's really anything I need to add to that. I'd obviously be glad to take questions. Mr. Callahan is going to follow me. Thank you. Thank you, Your Honors. My name is Charles Callahan, and I represent the school district. And because the school board members are largely the policymakers, I'll be speaking a little bit on their behalf as well, because we share some common issues. The phraseology that Mr. Woods was searching for a little bit ago was that Judge Broomfield stated that Mr. Lopez received more process than he was due, and that this proceeding, this hearing, was about as pure as human frailties could make it. And the plaintiff's suggestion, Meek's suggestion, to the contrary, is just that, Meek. I can't state it any better than Judge Broomfield did. And the record and the case law infinitely supports that determination, and plaintiff hasn't done anything to challenge it here. As Mr. Woods touched on and as Your Honor recognized, 11 days of hearing, 2,000 pages of transcript, Mr. Montoya's objections, motions, arguments, cross-examination, calling 21, all of that stuff. And the plaintiff comes up with four items, which she claims demonstrates  And the other thing I'm wondering is, on the property interest, I think at your position there's no property interest because there was a year-to-year contract. Is that correct? There is a property interest, but only in that – because he was terminated midyear. He was signed a contract, I believe, in June of 94, the 94-95 school year, and he was terminated in November of 94, midcontract. Well, his property interest is for that half year. The remainder of that contract only. And then it would be your position that there was a full hearing complying with due process. Now, on the liberty interest, assuming that there is a claim of stigmatization, which I assume there is, how is that – how is due process provided for him on that claim? The liberty interest – there is no liberty interest in reputation alone. The cases are clear on that. And this Court's decision versus, I believe, San Francisco, city of San Francisco, you have to have stigmatizing charges plus a loss of a tangible interest. And here, the only liberty interest loss that the plaintiff alleged was the loss of future employment, and Judge Broomfield found that that was completely lacking in factual support. And the record bears that out. And the plaintiff doesn't even really challenge that anymore. The plaintiff has suggested in her – And wasn't his claim that he was being stigmatized? Yes. But that alone, without loss of future employment – Okay. Well, just stay with me. Okay. I'm sorry, Your Honor. For the claim of being stigmatized, what type of processes do him? He has to be given notice of the charges, an opportunity. He has to challenge the fault or the accuracy of those charges, and he has to be given an opportunity, a hearing, to clear his name. That's it. A reasonably fair – He has to have a hearing to have the opportunity to refute. Right. Okay. At this hearing, in what way was he given an opportunity to refute the charges? His attorney was allowed to cross-examine all the witnesses that were called by the superintendent's attorney, Mr. Ortega. He made motions, objections, arguments. He used his own evidence. He called 20 witnesses on behalf of Mr. Lopez. Mr. Lopez himself testified extensively all about these charges and whether or not they were sufficient and whether they justified termination. And was there any prevention of him responding to refute the stigmatization? I'm sorry, Your Honor. Maybe I'm not quite – Was there anything done in the hearing that kept him from fully refuting the charge that he was being stigmatized? No. So he was given a full opportunity to respond. Absolutely. And I don't think Ms. Prakla suggested to the contrary. So that part of due process has been fulfilled. So what do we have left after that? The tampering. The bias issue. The biases. The bias issue is about – that's about all we're left with. The failure to talk together. Now, why aren't those issues that the judge should have heard more on rather than cutting this case off early before the jury got it? Well, the issue of bias starts from – starts from the strong presumption, as the case law characterizes it, of the school board members being members of honesty, integrity, and impartiality. And that strong presumption, in the language of the cases, can only be overcome in the most extreme of cases.  Now, Ms. Prakla, in her reply brief, has suggested, in light of that, recognition that, well, the district court characterized the evidence, affirmative evidence of bias as peculiar. And in recognition of that, Ms. Prakla, in her reply brief, has now suggested, well, you can either show affirmative evidence of bias or, as we've done here, get enough stuff together to create the appearance of impropriety. But that's not what the cases say. The cases say you can do it by affirmative evidence of bias or by showing the appearance of impropriety because of the board members having a personal or pecuniary interest in the outcome. That's when you can have – rest on the appearance of impropriety. Here, there's absolutely no suggestion that any of the board members had any pecuniary or personal stake in the outcome of this termination hearing. And because of that, the appearance of impropriety is just – it's an irrelevant analysis. You need to prove – produce affirmative evidence of bias, and that wasn't done here. I wanted to make just a couple of comments on Ms. Prakla's allegations of bias. She said that the testimony and the evidence in the closed sessions wasn't relevant. That's not true. The testimony in the closed sessions was about Mr. Lopez being too familiar with staff, about him having people, staff in his office with the door shut, about him taking teachers to his home, about being counseled on the policies and procedures of the district. All of that stuff goes to notice and corroboration and credibility of the complainants, notice to Mr. Lopez that his conduct may be inappropriate and that he shouldn't do that. All of that was entirely relevant and important to the determinations. So the fact that one of the decision-makers said, I based my decision on a lot on what happened there, you would say that's perfectly appropriate because the information was relevant to the issues? Absolutely, because the talk he had made in many admissions about being ---- What about the decision-maker who recused himself on the ground that he'd received information outside the record and the allegation that he had polluted the other decision-makers by passing that on to them? I'll make a comment on that, and then I want to pass to Mr. Holahan. The case ---- there's cases in Arizona or the ---- there's cases in the Ninth Circuit that I cited to you in the briefs where a trial judge who presided over the capital murder trial who had also previously presided over accomplices in the murder and brought information or knowledge from those cases to bear on the capital murder case, this Court has said in the Pizzuto, Ortiz, and Paradis case, that is not sufficient evidence of bias. And if that is not evidence of bias in a capital murder case, I don't see how you can carry over and say that that's evidence in a school board administrative termination case. And the fact is that all of the members were polled or vardyred by the board attorney, and they said, we don't listen to what Mr. Carpenter has to say. One of them said, I told him not to tell me anything to go talk to the attorney. One of them said, he's nothing but innuendos and hearsay. We don't listen to him. And the plaintiff has done nothing to bring any evidence that that was other than the case. Thank you. If it pleases the Court, my name is Brian Holahan and I represent Mr. Ortega. The reason that I wanted to stand up here is to make sure that the Court appreciates the position that my client is in. There isn't any suggestion, any claim against my client for 1983 violations in connection with the hearing itself. The plaintiff made the conscious decision not to pursue those claims, presumably because my client would enjoy absolute immunity. The claims against my client are limited to he did a bad investigation and he committed some kind of deprivation at the board hearing in which the charges were presented. In his order, Judge Broomfield found that there wasn't a deprivation committed by my client in either of those two events. In our opening brief, we pointed that out. We pointed out that the plaintiff had not, in his opening brief, addressed that. And there's no address, it's not addressed in the reply brief. As it now stands, there is a lower court finding that my client committed no deprivations and no briefing by the plaintiff why that's wrong. Now, there is substantial briefing about how my client supposedly lost his qualified immunity, but the entirety of it appears at page 28 of the reply brief. Thus, my client should have been aware that the plaintiff's due process rights were endangered by my client's ex parte meeting with the board. Well, I don't see deprivation discussed anywhere there. But that doesn't have anything to do with the charges against my client. My client was accused of committing some horrible in the investigation and the pre-hearing presentation and considering the limited case against my client, the lack of evidence and the lack of opening brief, the judgment as to my client should be affirmed. Thank you. Ms. Brito. Thank you, Your Honors. I've got two points to make because I know I don't have a lot of time. One is about Attorney Daniel Ortega because I didn't say anything at the beginning about the July 12th hearing before the board. The judge characterized, the district court judge characterized this as Mr. Ortega's mistake about the verb that he used on July 4th that he talked about the board having to adopt the charges versus presenting charges. It's a lot more than a verb. The point is the board did not have to do anything to take any action on July 12th. Daniel Ortega told them that they had to adopt the charges. Because he told them they had to do something, I think I'm done. Can I continue? I will, please. Because he told them they had to do something. That ended up with an executive session where they consulted with him who was not their attorney and he gave them the one-sided version, and then a public session where he read everything aloud in English and Spanish. The point is if he'd followed the statute and the statement of charges had just been presented to the board, none of those things would have happened. It is related to a deprivation because here is a public statement about Mr. Lopez that was unnecessary that certainly impacted his reputation and good name. What did the state court say about that, if anything? The state court said nothing about that. The only issue that was actually presented to the state court had to do with the dual role that Mr. Ortega had played in that he had first advised the school board about the charges and then he had acted as a prosecutor. That was the only thing that went to the state superior court. Thank you. Thank you. Counsel, thank you for your argument in this matter. The matter will be submitted. Court will stand in recess for the day.
judges: Wallace, Trott, Rymer